**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Perry Mitchell,

        Plaintiff,

v.

GEO Group Incorporated,

        Defendant.

No. CV-19-04445-PHX-DWL

**ORDER**

Perry Mitchell ("Plaintiff") slipped while walking across a lobby floor that had just been buffed by an employee of Geo Group Inc. ("Defendant"). Plaintiff was later diagnosed with a herniated disc in his back that required surgery. In this action, Plaintiff asserts a negligence claim against Defendant and seeks to recover damages arising from his back injury. Now pending before the Court are (1) Defendant's "motion to preclude any expert testimony by plaintiff on causation" (Doc. 61); and (2) Defendant's motion for summary judgment (Doc. 67). For the following reasons, the former is granted in part and denied in part and the latter is denied.

## BACKGROUND

I.   <u>Factual History</u>

The facts summarized below, and detailed throughout this order, are taken from the materials attached to the parties' motion papers and other documents in the record. The facts are uncontroverted unless otherwise noted.

…

A.    **The June 12, 2018 Slipping Incident**

On June 12, 2018, Plaintiff was performing a safety compliance inspection at KCRC, a facility in Texas that is managed and operated by Defendant.  (Doc. 77-1 at 3-6.) As Plaintiff was leaving the facility, one of Defendant's employees, non-party Armando Pompa, was buffing the floor.  (Doc. 77-4 at 6; Doc. 77-7 at 5.)  At some point in the buffing process, Pompa sprayed a cleaning liquid known as "Spray Buff" on the floor. (Doc. 77-4 at 6; Doc. 77-7 at 5.)  However, Pompa "completely forg[o]t to put the wet floor sign out."  (Doc. 77-7 at 9.)

When Plaintiff walked across the lobby, he slipped (but did not fall) and twisted his back.  (Doc. 67-4 at 13.)  Plaintiff immediately felt a pinching sensation and reported the incident to Defendant's facility administrator.  (*Id.*)  The incident was captured on surveillance video and documented by Defendant's fire and safety manager in a report that contained the statements of two eyewitnesses.  (Doc. 77-2 at 13.)

After returning to Arizona, Plaintiff experienced worsening symptoms and initiated a worker's compensation claim with his non-party employer.  (Doc. 77-1 at 15.)  Plaintiff was sent to Concentra, where he was diagnosed with a low back strain and prescribed physical therapy.  (*Id.* at 16.)  After Plaintiff "didn't get relief from physical therapy," he requested to see his neurosurgeon, Dr. Willis, who had performed two prior spinal fusion surgeries on him.  (*Id.* at 16-17.)

B.    **Dr. Willis**

On July 10, 2018, which was 28 days after the incident, Plaintiff had an MRI performed on his back at the request of Dr. Willis.  (Doc. 77-1 at 18; Doc. 77-10.)  Based on the MRI results, Dr. Willis diagnosed a large disc herniation that eventually required a third fusion surgery.  (*Id.*)

One of the disputed issues in this case is whether Dr. Willis should be allowed to offer the opinion—in his capacity as Plaintiff's treating physician—that the June 12, 2018 incident was the cause of Plaintiff's disc herniation.  In a "Neurosurgical Consultation" report written on August 1, 2018, Dr. Willis stated that the incident—which Dr. Willis

mistakenly characterized as involving a "fall"—was "most likely" the cause of the injury:

> The patient has severe L2-L3 stenosis with compression of the cauda equina with associated right leg weakness and numbness in 2 separate episodes of urinary incontinence referable to the stenosis. . . .  *There is a large central disc herniation that is most likely acute and related to the patient's fall* that has caused him to have symptomatic stenosis at this level. . . .  Although the patient has some degree of expected adjacent segment degenerative change the patient's fall at work and acute onset of symptoms in the setting of a new large central disc herniation would suggest that the precipitating an[d] aggravating anatomic factor is the disc herniation directly referable to his fall.

(Doc. 64-3 at 3, emphasis added.)

During the discovery process, Plaintiff chose to depose Dr. Willis.  During oral argument, Plaintiff's counsel explained that "the real reason" he deposed Dr. Willis was because Dr. Willis "had assumed that [Plaintiff] had fallen and not caught himself from falling.  And so what I need[ed] to find out is, did it make any difference to him as to what he was saying in his 8/1/18 record about causation . . . if the truth was that [Plaintiff] never really fell?"

Accordingly, during the first part of the deposition, Plaintiff's counsel asked Dr. Willis whether the fact that Plaintiff "didn't fall, he slipped and twisted his back" would "change anything about what you're saying here about why you think [Plaintiff's] . . . disc herniation was related to his . . . work related injury event." (Doc. 64-4 at 8.)  In response, Dr. Willis stated that "[t]here really is no difference from my standpoint and the etiology of the disc herniation whether [Plaintiff] fell or twisted hard." (*Id.* at 9.)  Later, in response to additional questioning by Plaintiff's counsel, Dr. Willis seemed to repeat the causation opinion set forth in his August 1, 2018 report.  (*Id.* at 11 ["[S]o most likely what happens in [Plaintiff's] case is that his prior fusions had made the L-2/3 area vulnerable and may have had some accelerated degenerative weakening of that area, and a twist, or whatever you want to call it, an acute force in the spine could have—certainly could have caused a disc herniation there."]; *id.* at 15-16 [Q: "And back then you related that large disc herniation to this fall, correct?"  A: "Yeah.  I mean that was . . . the assumption.  Trying to

put it all together, that was the most likely scenario."].)

During the latter part of the deposition, Dr. Willis was questioned by defense counsel on the issue of causation. Defense counsel began by asking Dr. Willis whether Plaintiff's disc herniation could have been caused by events unrelated to the slipping incident, such as "sneez[ing]" or "stepp[ing] wrong going up and down the stairs." (Doc. 61-3 at 8-9.) Dr. Willis agreed that such events could have caused the herniation. (*Id.*) Critically, defense counsel and Dr. Willis then engaged in the following colloquy:

> Q.   You are not here today to offer specific testimony as to the injury-causing mechanism for [Plaintiff], are you, Doctor?
>
> A.   That would be correct. In my note I attempt to create some sort of a narrative there based on the patient's history, but that's not the – the point is to treat the problem from a medical standpoint and get the patient better, not to go figuring out exactly what caused that. Unless it's relevant for the treatment. Which in this case it wasn't.

(*Id.* at 9.)

### C.   **Other Experts**

During the discovery process, Defendant retained various experts, including biomechanical expert Michael Kuzel. Although Mr. Kuzel's expert report is not part of the record, it appears that Mr. Kuzel opined that the "forces created by [Plaintiff's] slip were insufficient to cause or aggravate disk herniation." (Doc. 61-1 at 16.) In reliance on this opinion, another of Defendant's experts, Dr. Barry Hendin, opined that "in view of Mr. Kuzel's assessment of biomechanical forces, it is possible but not probable that [Plaintiff's] slip of June 12, 2018 resulted in his disk herniation and his need for [surgery] on December 4, 2018." (*Id.*)

Plaintiff's retained biomechanical expert, Kerry Knapp, Ph.D., issued a rebuttal report following the issuance of the reports by Mr. Kuzel and Dr. Hendin. (Doc. 61-2.) As relevant here, Dr. Knapp opined that Mr. Kuzel's opinions should be disregarded because "Mr. Kuzel fail[ed] to meet his own criteria for a valid injury biomechanics analysis" and that, because Dr. Hendin relied on Mr. Kuzel's opinions, "Dr. Hendin's 'impression' is also invalidated." (*Id.* at 6-7.)

II.     <u>Procedural History</u>

On June 11, 2019, Plaintiff initiated this action by filing a complaint.  (Doc. 1.)

On August 29, 2019, Plaintiff filed the operative pleading, the first amended complaint ("FAC").  (Doc. 7.)

On August 16, 2021, Defendant moved to preclude any expert testimony by Dr. Willis and Dr. Knapp on causation.  (Doc. 61.)

On September 10, 2021, Plaintiff responded to the motion to preclude.  (Doc. 64.)

On September 17, 2021, Defendant filed a reply in support of the motion to preclude.  (Doc. 66.)

On October 4, 2021, Defendant moved for summary judgment.  (Doc. 67.)

On December 9, 2021, Plaintiff filed an amended response to the motion for summary judgment.  (Doc. 77.)

On December 22, 2021, Defendant filed an amended reply in support of the motion for summary judgment.  (Doc. 78.)  This filing also incorporated, by reference, the arguments made in an earlier version of the reply.  (Doc. 73.)

On March 9, 2022, the Court issued a tentative ruling.  (Doc. 80.)

On March 22, 2022, the Court heard oral argument.  (Doc. 83.)

Following oral argument, Defendant filed a supplement to address one of the cases cited by Plaintiff's counsel during oral argument.  (Doc. 82.)

## DISCUSSION

I.     <u>Motion To Preclude</u>

A.     **Legal Standard**

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  It provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the

1    expert has reliably applied the principles and methods to the facts of the case."  A district

2    court has broad discretion in deciding to admit or exclude expert testimony, guided by a

3    two-part test that focuses on the opinion's relevance and reliability.  *Daubert v. Merrell*

4    *Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *United States v. Hankey*, 203 F.3d 1160, 1168

5    (9th Cir. 2000).  "The inquiry envisioned by Rule 702 is . . . a flexible one."  *Daubert*, 509

6    U.S. at 594.  "The focus, of course, must be solely on principles and methodology, not on

7    the conclusions that they generate."  *Id.* at 595.

8         "Shaky but admissible evidence is to be attacked by cross examination, contrary

9    evidence, and attention to the burden of proof, not exclusion."  *Primiano v. Cook*, 598 F.3d

10   558, 564 (9th Cir. 2010).  "Basically, the judge is supposed to screen the jury from

11   unreliable nonsense opinions, but not exclude opinions merely because they are

12   impeachable."  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th

13   Cir. 2013).  *See also* Fed. R. Evid. 702, cmt. 2000 amendment ("[P]roponents do not have

14   to demonstrate to the judge by a preponderance of the evidence that the assessments of

15   their experts are correct, they only have to demonstrate by a preponderance of evidence

16   that their opinions are reliable. . . .  The evidentiary requirement of reliability is lower than

17   the merits standard of correctness.") (alteration in original) (internal quotation marks

18   omitted).

19        B.    **The Parties' Arguments**

20        Defendant moves to exclude the causation-related opinions of Dr. Willis, Plaintiff's

21   treating physician, and Dr. Knapp, Plaintiff's biomechanics expert.  (Doc. 61.)  As for Dr.

22   Willis, Defendant contends he should not be allowed to offer an opinion on causation

23   because he admitted during his deposition that he assessed Plaintiff "from a medical

24   standpoint to get the patient (Plaintiff) better and not to determine[] what caused the issue,

25   as it was not relevant for treatment."  (*Id.* at 4.)  As for Dr. Knapp, Defendant contends he

26   should not be allowed to offer an opinion on causation because he "is *not* a medical doctor"

27   and "has no basis of any kind to substantiate medical causation."  (*Id.* at 3-4.)

28        Plaintiff opposes Defendant's motion.  (Doc. 64.)  As for Dr. Willis, Plaintiff cites

an array of cases recognizing that treating physicians may testify to causation opinions that arise during treatment and not at the request of counsel.  (*Id.* at 9-12.)  Plaintiff contends that Dr. Willis's challenged causation opinion is admissible under these principles because he opined about the causal link between the slip incident and Plaintiff's disc herniation in the course of treating the herniation.  (*Id.* at 12-14.)  Plaintiff also contends that "Dr. Willis's credentials are more than sufficient to qualify as an expert" and that Dr. Willis applied a reliable methodology in reaching his causation-related opinion because "he forms diagnoses all the time based in part on what a patient says in his history; his data inputs are typically imaging (in this case MRI finding of new large disc herniation 28 days after the date of injury), exam findings, and the history from the patient; his prior treatment of Plaintiff gave him unique perspective as to Plaintiff's history and what caused Plaintiff's disc herniation; and there was no evidence of an agenda for secondary gain."  (*Id.*)  Finally, as for Dr. Willis's statement during his deposition that he is *not* offering an opinion on causation, Plaintiff contends in a footnote that "Dr. Willis's testimony during cross examination does not erase the causation opinions Dr. Willis already expressed in his record."  (*Id.* at 4 n.1.)  As for Dr. Knapp, Plaintiff clarifies that he "offer[ed] no opinion on medical causation" and simply offered criticisms of the opinions of the defense's biomechanical expert, Mr. Kuzel, and of the derivative opinions of the defense's causation expert, Dr. Hendin.  (*Id.* at 15-17.)  Plaintiff argues that Dr. Knapp was qualified to offer these opinions because many (albeit not all) "courts have held that the fact that a biomechanical expert is not a medical doctor does not mean that he is not qualified to offer an opinion as to specific causation."  (*Id.*)

In reply, Defendant argues that Dr. Willis should not be allowed to offer causation-related opinions because (1) Plaintiff's initial treating medical provider diagnosed a low back strain, (2) Plaintiff did not see Dr. Willis until 28 days after the incident, and (3) Dr. Willis "explain[ed] that you can wake up in the morning and have a disc herniation or the disc can herniate for a variety of reasons such as sneezing or walking up and down stairs"— which, according to Defendant, demonstrates that Plaintiff cannot make the requisite causal

connection.  (Doc. 66 at 1-2.)  Defendant also reasserts that Dr. Willis admitted that "from a medical standpoint as a treating physician in the workers compensation setting, it is irrelevant what caused the herniation—as his only focus is to provide treatment to get the patient better."  (*Id.*)  As for Dr. Knapp, Defendant's arguments are not a model of clarity.  (*Id.* at 2-3.)  After accusing Plaintiff of "intend[ing] to confuse and mislead the jury . . . by offering biomechanical engineering issues under the guise of medical causation," Defendant contends that Dr. Knapp "offers the scientifically reliable evidence as the basis to support Dr. Willis' medical opinions (which is nothing more than unsupported speculation as Dr. Willis does not offer causation opinions)" and argues that "[s]uch tactic is nothing more than inadmissible conjecture."  (*Id.*)  Defendant also clarifies that "[t]he only reason Kerry Knapp was referenced in the moving papers was to highlight the issue that an engineer does not have the requisite basis to criticize medical causation opinions from a qualified defense medical expert."  (*Id.*)

C.  **Analysis**

The Court agrees with Defendant that Dr. Willis should be precluded from offering any causation-related opinions in this case.  Much of Plaintiff's briefing focuses on whether treating physicians may, in general, testify about causation opinions formed in the course of treatment.  Plaintiff is correct that, in general, such opinions may be admissible if properly disclosed.[1]  Thus, if the record in this case were confined to Dr. Willis's

---

[1]     *See, e.g.*, *Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 869-70 (6th Cir. 2007) (reversing district court's exclusion of causation-related opinions by treating physician and emphasizing "the obvious fact that doctors may need to determine the cause of an injury in order to treat it.  Determining causation may therefore be an integral part of 'treating' a patient"); *Prater v. Consolidated Rail Corp.*, 272 F. Supp. 2d 706, 711 (N.D. Ohio 2003) ("As a treating physician, Dr. Reveal can give and explain his diagnosis of the plaintiff's condition and his view of its cause."); *Starling v. Union Pacific R. Co.*, 203 F.R.D. 468, 479 (D. Kan. 2001) ("[T]he prevailing weight of authority today is that, to the limited extent that opinions about the cause of an injury are a necessary part of a patient's treatment, treating physicians may opine on causation . . . ."); *Salas v. United States*, 165 F.R.D. 31, 33 (W.D.N.Y. 1995) ("As a general rule, a treating physician considers not just the plaintiff's diagnosis and prognosis, but also the cause of the plaintiff's injuries. . . . Accordingly, questioning these physicians as to whether the injuries for which they treated the plaintiff can be causally related to the accident would appear to be within the scope of the patient's care and treatment.").  *See generally* 2 S. Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 26, at 807 (2022) ("Unless the treating physician is going to be limited to testifying about facts in a lay person capacity, the physician must be disclosed as an expert . . . .  Whether the treating physician must file a written report or

"Neurosurgical Consultation" report issued on August 1, 2018, which contains the assertion that Plaintiff's "large central disc herniation . . . is most likely acute and related to the patient's fall" (Doc. 64-3 at 3), there is a strong argument that Dr. Willis would be allowed to offer that opinion at trial.

The complication here arises from Dr. Willis's deposition testimony. As summarized above, although Dr. Willis made statements during the first part of his deposition in which he seemed to repeat the causation opinion set forth in his August 1, 2018 report, Dr. Willis then retreated from that opinion during the latter part of his deposition. Critically, when defense counsel asked Dr. Willis to confirm that he was "not here today to offer specific testimony as to the injury-causing mechanism," Dr. Willis responded by stating, in clear and unambiguous terms, that defense counsel's characterization of his position was "correct," that the causation-related statements in his August 1, 2018 report were simply offered "to create some sort of narrative there based on the patient's history," and that the issue of causation wasn't even "relevant" to his evaluation of Plaintiff because "the point is to treat the problem from a medical standpoint and get the patient better, not to go figuring out exactly what caused [the injury]." (Doc. 61-3 at 9.)

It is one thing when an expert makes statements during a deposition that are difficult to reconcile with the opinions disclosed in the expert's report. In that scenario, the proper approach is usually to allow the expert to offer the opinions at trial, to allow the opposing party to impeach the expert with the deposition testimony, and to allow the jury to sort things out.[2] In contrast, when an expert affirmatively repudiates or disavows an opinion

---

is subject only to summary disclosures depends on the role of the expert. . . . Treating physicians for whom summary disclosures are provided may opine on matters relating to treatment and diagnosis.").

[2] *See, e.g.*, *Williams v. Bridgeport Music, Inc.*, 2014 WL 7877773, *19 (C.D. Cal. 2014) ("Plaintiffs attempt to disqualify or impeach Finell by pointing to alleged inconsistencies between her report and declaration in this case, her deposition testimony and her testimony in prior cases. Defendants attempt to do the same as to Wilbur. This evidence does not warrant the exclusion of either expert's testimony.") (citations omitted). *See generally Alaska Rent-A-Car*, 738 F.3d at 969 ("Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.").

expressed in the expert's report, courts have not hesitated to conclude that the expert should be precluded from offering that opinion at trial.[3]   Accordingly, the analysis here turns on whether Dr. Willis's statements during his deposition are merely difficult to reconcile with his earlier-stated causation opinion or whether those statements amount to a disavowal of that opinion.

The deposition transcript compels the conclusion that the latter characterization is more accurate.  Dr. Willis was asked, point-blank, to verify that he wasn't offering any causation-related opinions and he responded by confirming that he wasn't doing so.  This was no mere slip of the tongue.  Dr. Willis went on to explain that the issue of causation wasn't "relevant" to his treatment of Plaintiff because his role "from a medical standpoint [was to] get the patient better, not to go figuring out exactly what caused" Plaintiff's disc herniation.  Exclusion is warranted in this circumstance.  *Compare Chartier v. Brabender Technologie, Inc.*, 2011 WL 4732940, *7-8 (D. Mass. 2011) ("[E]xpert witnesses should generally be held to their testimonial concessions, particularly where those concessions contradict their earlier expert reports.  There might be circumstances, of course, under which such contradictions might be satisfactorily explained.  An expert might, for example, explain that he was confused by an ambiguous question, or that he made an inadvertent

---

[3]     *See, e.g., Devito v. Smithkline Beecham Corp.*, 2004 WL 3691343, *4 (N.D.N.Y. 2004) ("[O]rdinarily once a court finds a witness qualified as an expert, the next issue is the admissibility of that witness' opinion testimony.  Here, however, it appears that each of the opinions which plaintiff attributes to Dr. George have been expressly disavowed in his deposition.  Dr. George was asked point blank whether he had formed any of the three opinions quoted above, and whether he was prepared to testify to same.  Each time he answered no.  Obviously, if Dr. George has not formed the opinions which plaintiff is ascribing to him, necessarily he has no foundation, scientific or otherwise, for same. Accordingly, the court excludes the opinion testimony outlined above which plaintiff is attributing to Dr. George."); *Fabrizi v. Rexall Sundown, Inc.*, 2004 WL 1202984, *10 (W.D. Pa. 2004) ("[A]lthough [Dr. Roberts's] Expert Report claims to state an opinion regarding specific causation, she repeatedly . . . disavowed the requisite knowledge and expertise to offer the same [during her deposition].  For all of these reasons, Dr. Roberts' opinions are inadmissible and they cannot sustain the Plaintiff's burden regarding causation."); *Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, 2014 WL 1494026, *8 (W.D. Wash. 2014) ("Although AFM insists . . . that Mr. Rongren's experience qualifies him as an expert witness, AFM never addresses in any way the foregoing testimony in which Mr. Rongren explicitly disavows any . . . opinion as to the Monorail's actual grounding system. . . .  Mr. Rongren is not qualified to testify as an expert as to the Monorail's actual grounding system during that period of time . . . in light of his unequivocal repudiation of any . . . opinion on the issue.").

slip of the tongue.  No such explanation, however, was even attempted here.  The motion to strike the expert report will therefore be granted to the extent that the report contains statements that were directly contradicted by Dobson's later deposition testimony, and as to which no satisfactory explanation has been given."), *with Paliwoda v. Showman*, 2014 WL 3925508, *4 (D. Kan. 2014) (declining to strike expert's opinion, even though expert seemed to disavow that opinion during his deposition, because "[a]n expert opinion contradicted in the expert's deposition does not necessarily warrant the preclusion of the opinion if the testimony was caused by confusion or an inadvertent slip of the tongue").

The decision in *Windhurst v. Arizona Department of Corrections*, 501 P.3d 752 (Ariz. Ct. App. 2021), which Plaintiff cited for the first time during oral argument,[4] does not compel a different result.  As an initial matter, *Windhurst* is an Arizona state-court decision that does not control how this Court should discharge its gatekeeping responsibilities under Rule 702.

*Windhurst* is also factually distinguishable.  There, the plaintiff in a medical malpractice case retained a nurse, Panosky, to testify about causation and breach.  *Id.* at 754.  During her deposition, Panosky repeatedly and unambiguously opined that the defendants' conduct was the cause of the underlying injuries.[5]  However, Panosky also answered "not specifically" when asked if she was "offering any medical causation opinions in this case."  *Id.* at 760.  The defendants seized on that statement to argue that Panosky's testimony was insufficient to create a triable issue of fact on the issue of causation for summary judgment purposes.  *Id.*  The Arizona Court of Appeals disagreed, explaining that a careful "review of the record" revealed that Panosky had not, in fact,

---

[4]    The Court does not fault Plaintiff for this approach because *Windhurst* was decided after Plaintiff filed his response to the motion to exclude.

[5]    *See, e.g.*, *Windhurst*, 501 P.3d at 759 ("Panosky opined that the issue with the leaking catheter 'could have contributed to his sepsis.'"); *id.* at 760 ("Panosky tied the nursing staff's deficiencies in catheter care to the development of Mr. Windhurst's wounds and related care."); *id.* ("Panosky further testified that several other inactions of the nursing staff had 'attributed [sic] to causing his infection getting worse, . . . him going into sepsis, and eventually dying.'  From this testimony, and the report on which her testimony was based, a reasonable juror could conclude that the deficiencies and delays in Mr. Windhurst's care by the nurses were a contributing cause of his death.") (alteration in original).

disavowed her causation opinions during her deposition.  *Id.* ("Corizon . . . points out that at her deposition, Panosky testified that she was '[n]ot specifically' 'offering any medical causation opinions in this case.'  Based on our review of the record, she nonetheless did so . . . .") (alteration in original).

*Windhurst* is simply the latest in a line of Arizona decisions recognizing that an expert's opinions that go, in substance, to the issue of causation should not be discounted simply because the expert declined to characterize them as formal "medical causation opinions" during the expert's deposition.  *See, e.g.*, *Rasor v. Northwest Hospital LLC*, 419 P.3d 956, 962 (Ariz. Ct. App. 2018) ("[W]e disagree with the hospital's conclusion that Ho disqualified herself by stating she was making 'an assessment' of causation rather than a medical diagnosis of causation.  Northwest has identified no authority, nor are we aware of any, for the proposition that testimony on the causation of injuries must be a 'medical diagnosis' as opposed to 'an assessment.'").  But again, that is not the situation here.  Dr. Willis specifically denied having any opinion about whether there is a causal connection between the June 12, 2018 slipping incident and Plaintiff's herniated disc and went on to explain why it was unnecessary for him to form an opinion on that topic.  This was not an ambiguous concession that can be chalked up to confusion or semantics.

This leaves Dr. Knapp.  Defendant appears to take issue only with Dr. Knapp's qualifications, arguing that he is not a medical doctor and is therefore not qualified to offer medical causation opinions.  Putting aside the fact that the Court does not construe Dr. Knapp's report as purporting to offer any medical causation opinions—instead, Dr. Knapp merely criticizes the biomechanical opinions of Defendant's biomechanics expert, Mr. Kuzel, and then observes that Dr. Hendin's opinion is derivative of Mr. Kuzel's challenged opinion—this argument fails on the merits.  As Plaintiff points out in his response brief, courts have held that biomechanical experts with qualifications similar to those of Dr. Knapp are qualified to opine on issues of causation.  *See, e.g.*, *Pennsylvania Trust Co. v. Dorel Juvenile Group, Inc.*, 851 F. Supp. 2d 831, 838-39 (E.D. Pa. 2011) (allowing biomechanical engineer to offer expert testimony in part because "[a] medical degree is not

a prerequisite to qualification as an expert capable of testifying as to the cause of a person's injuries"); *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 742-43 (N.D. Ill. 2005) (concluding that biomechanical engineer's qualifications were sufficient to allow her to testify as to biomechanical causes of the plaintiff's injuries); *Yu-Santos v. Ford Motor Co.*, 2009 WL 1392085, *13 (E.D. Cal. 2009) ("Defendants cite no legal authority for their proposition that only medical doctors are qualified to provide opinions on injury causation and biomechanics."). Those cases are persuasive, and Defendant makes no effort to address or distinguish them in its reply.

II.    <u>Motion For Summary Judgment</u>

   A.    **Legal Standard**

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). The Court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference[s] in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]o carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense."  *Id.* at 1103.  Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

### B.   **Breach**

#### 1.   The Parties' Arguments

Defendant argues that Plaintiff cannot establish a breach of the duty of care because (1) Defendant lacked notice of an unreasonably dangerous condition; and (2) the condition was open and obvious to Plaintiff.  (Doc. 67 at 3-6.)  As for the first point, Defendant notes that multiple people walked across the floor without incident while it was being buffed and argues that, under Arizona law, "evidence of prior incidents" is a prerequisite to liability.  (*Id.* at 3.)  As for the second point, Defendant contends that Plaintiff walked across the floor after standing in the reception area and seeing the lobby being buffed, making him aware of an open and obvious condition.  (*Id.* at 4.)  Defendant asserts that an "invitor should not be obligated to anticipate that invitees would fail to appreciate dangers generally known to be inherent in conditions which are obvious."  (*Id.*)

In response, Plaintiff argues that notice is not required to support a vicarious liability claim because "Arizona law clearly states that the proprietor of a business is under an affirmative duty to make the premises reasonably safe for use by invitees and is deemed to have notice of an unreasonably dangerous condition if its employee created the condition."  (Doc. 77 at 7-10.)  Plaintiff also contends that notice is irrelevant because one of his theories of liability is negligent training, supervision, and oversight, which is present here because Defendant knew or should have known that Pompa was inadequately trained on when to put out a wet floor sign, Defendant did not oversee the buffing process, and Defendant's policies and procedures manual did not address how to safely clean the floors.  (*Id.* at 9-10.)  As for Defendant's second argument, Plaintiff responds that, under Arizona

- 14 -

law, Defendant was required to use reasonable care to warn of the dangerous condition even if it was open and obvious. (*Id.* at 10.) Alternatively, Plaintiff contends the dangerous condition was not open and obvious because "there were no warning signs, wet floor signs, or other similar indicators placed in the lobby area," he did not see Pompa buffing the floor in the area he walked across, he did not see Pompa spraying the floor with liquid, and several other people slipped while walking across the floor. (*Id.* at 10-11.)

In reply, Defendant disputes that there was some mandate to display the wet floor sign when the floor was being buffed and argues that "Plaintiff wants the Court to believe that while he was standing at the sign in desk (and looking into the lobby) he could not appreciate the open and obvious condition, yet somehow signage would have altered his appreciation for the circumstances." (Doc. 78 at 2.) Defendant also reiterates that "[t]he record is devoid of any evidence of notice of any prior slips or falls at the subject facility" and that a "facility is not obligated to anticipate that Plaintiff would fail to appreciate dangers generally known to be inherent in conditions which are obvious." (Doc. 73 at 2.)

## 2.   Analysis

Under Arizona law, the element of breach in a negligence action is a "factual matter[]" that is "usually decided by the jury." *Gipson v. Kasey*, 150 P.3d 228, 230 & n.1 (Ariz. 2007). *See also Walker v. Montgomery Ward & Co.*, 511 P.2d 699, 702 (Ariz. Ct. App. 1973) ("The issue of whether the owner of premises open to the public has exercised the care required of him to keep them in a reasonably safe condition for his invitees generally is a question of fact for the jury."). With that said, "the owner of a business is not an insurer of the safety of a business invitee, but only owes a duty to exercise reasonable care to his invitees. The mere occurrence of a fall on a floor within business premises is insufficient to prove negligence on the part of the proprietor." *Walker*, 511 P.2d at 702 (citations omitted). *See also Burke v. Arizona Biltmore Hotel, Inc.*, 467 P.2d 781, 783 (Ariz. Ct. App. 1970) ("'Defective condition' is not necessarily synonymous with 'dangerous condition' and becomes so only when the defective condition creates an unreasonable risk of harm. The mere fact that an injury has been sustained does not give

rise to a presumption that a defective condition created an unreasonable risk of harm.") (citations omitted).

Thus, as a "general proposition" under Arizona law, "to impose liability on the proprietor for injuries sustained by an invitee, the plaintiff must prove either, (1) that the foreign substance or dangerous condition is the result of defendant's acts or the acts of his servants, (2) that defendant had actual knowledge or notice of the existence of the foreign substance or dangerous condition, or (3) that the condition existed for such a length of time that in the exercise of ordinary care the proprietor should have known of it and taken action to remedy it." *Walker*, 511 P.2d at 702 (citations omitted).  As this formulation makes clear, "actual knowledge or notice" to the defendant (No. 2 in the list) is not necessary if the defendant's employee created the dangerous condition at issue (No. 1 in the list). *Dulles v. Safeway Stores, Inc.*, 810 P.2d 627, 630 (Ariz. Ct. App. 1991) ("[I]n the context of a slip-and-fall claim, a plaintiff may avoid the onus of showing the defendant's knowledge by presenting some evidence to show that it was more likely that the defendant's employees, rather than a third person, created the condition.") (cleaned up).

These principles doom Defendant's first breach-related argument, which is that Plaintiff cannot prevail on his negligence claim because there is no evidence of prior incidents.  As *Dulles* makes clear, notice of prior incidents is not required when the defendant's employee created the dangerous condition.  That is the case here.  Pompa, Defendant's employee, created the dangerous condition by buffing the floor and applying "Spray Buff" but forgetting to put out the wet floor sign.

Defendant's second argument fares no better.  "It is the general rule that a proprietor is not liable to an invitee for injuries from dangerous conditions which are obvious or as well known to the invitee as to the proprietor.  But, if the proprietor should anticipate the harm from the condition despite its obviousness, he may be liable for physical injury caused by that condition.  The fact that the injured party knew of the danger is not conclusive." *Tribe v Shell Oil Co., Inc.*, 652 P.2d 1040, 1042 (Ariz. 1982) (citations omitted).  *See also Johnson v. Tucson Ests., Inc.*, 683 P.2d 330, 332 (Ariz. Ct. App. 1984) ("The appellant's

first contention, that the wet and slippery floor was an open and obvious danger and therefore not unreasonably dangerous, is not a complete statement of Arizona law. . . .  The open and obvious condition is merely a factor to be taken into consideration in determining whether the condition was unreasonably dangerous.") (citation omitted).  Put another way:

> There are . . . cases in which the possessor of land can and should anticipate that the dangerous condition will cause physical harm to the invitee notwithstanding its known or obvious danger.  In such cases, the possessor is not relieved of the duty of reasonable care which he owes to the invitee for his protection.  This duty may require him to warn the invitee, or to take other reasonable steps to protect him, against the known or obvious condition or activity, if the possessor has reason to expect that the invitee will nevertheless suffer physical harm.  Such reason to expect harm to the visitor from known or obvious dangers may arise, for example, where the possessor has reason to expect that the invitee's attention may be distracted, so that he will not discover what is obvious, or will forget what he has discovered, or fail to protect himself against it.

*Id.* at 333 (quoting Rest. (Second) of Torts § 343(A)(1), cmt. f. (1965)).

Here, construing the facts in the light most favorable to Plaintiff, a reasonable juror could find that (1) the condition was not open and obvious, given Plaintiff's testimony that Pompa was spraying and buffing the floor in a separate area from where Plaintiff directly walked and that Plaintiff saw no signs or other indicators that the floor was slippery; and alternatively (2) Defendant should have anticipated that buffing the floor would create a dangerous condition, notwithstanding the obviousness of the danger.  *Cf. Tribe*, 652 P.2d at 1042 ("Reasonable minds could easily disagree as to whether a sixteen-inch step down is open and obvious to one who has ascended a six-inch step.  Summary judgment is inappropriate where founded on a disputed inference drawn from an undisputed fact.  Whether the step was dangerous, open and obvious or whether appellees should have anticipated the harm if open and obvious are issues to be decided by a jury in its capacity as triers of fact.") (citation omitted).

…

…

…

1

   C.   **Causation**

2

        1.   The Parties' Arguments

3  Defendant argues that Plaintiff cannot establish the element of proximate causation

4  for two reasons: (1) "medical expert testimony is required to establish causation," but Dr.

5  Willis's causation-related opinion is inadmissible, and "[w]ithout an admissible expert

6  causation opinion, all of Plaintiff's claims fail as a matter of law" (Doc. 67 at 6-8); and (2)

7  Plaintiff was not diagnosed with the disc herniation until 28 days after the accident, and

8  Plaintiff engaged in various "activities of daily living" during that 28-day period, so those

9  activities qualify as the "intervening and superseding cause" of the herniation (*id.* at 8-10).

10  Plaintiff responds that the evidence is legally sufficient to establish causation for

11  two independent reasons: first, because "the causal relationship is readily apparent" in light

12  of the undisputed facts that he immediately experienced a pinching sensation in his back

13  similar to his previous herniations, he immediately reported his injury, and it was not until

14  after the slip and twist incident that he required medical care; and second, because he has

15  "medical causation" evidence in the form of Dr. Willis's opinion.  (Doc. 77 at 11-13.)

16  Plaintiff also argues that, given this clear record as to the onset of his symptoms, Defendant

17  does not offer credible evidence of a superseding or intervening cause and the contention

18  that Plaintiff's disc herniation was caused by anything other than the slip and twist is pure

19  speculation.  (*Id.* at 13.)  Plaintiff contends that "whether Plaintiff's disc herniation was

20  caused by the June 12, 2018, slip and twist incident as alleged by Plaintiff, or caused by

21  traveling back to Arizona, continuing to do desk work from home, or walking up and down

22  stairs in his home as alleged by Defendant Geo, is a question fact for the jury."  (*Id.*)

23  Defendant replies by reasserting that Dr. Willis did not determine causation and that

24  "Plaintiff's stretched [causation] arguments, are at best, a possibility rather than a

25  probability."  (Doc. 78 at 2.)

26        2.   Analysis

27  Under Arizona law, "[t]o establish a prima facie case of negligence, a plaintiff must

28  show that the defendant's negligent acts were the proximate cause of the plaintiff's injuries.

A plaintiff proves [this] by demonstrating a natural and continuous sequence of events stemming from the defendant's act or omission, unbroken by any efficient intervening cause, that produces an injury, in whole or in part, and without which the injury would not have occurred." *Grafitti-Valenzuela ex rel. Graffiti v. City of Phoenix*, 167 P.3d 711, 717 (Ariz. Ct. App. 2007) (citations omitted). "A defendant's acts are the proximate cause of a plaintiff's injury only if they are a substantial factor in bringing about the harm. The mere possibility of causation is not enough. A plaintiff must show at trial that the injury would not have occurred 'but for' the defendant's negligent conduct. This is true even if the defendant's conduct contributed 'only a little' to the plaintiff's injuries. On summary judgment, the plaintiff must at least create a question of fact in this regard." *Id.* (citations omitted). Thus, "[a] party may prove proximate causation by presenting facts from which a causal relationship may be inferred, but the party cannot leave causation to the jury's speculation." *Salica v. Tucson Heart Hosp.-Carondelet, LLC*, 231 P.3d 946, 951 (Ariz. Ct. App. 2010) (citations omitted). *See also Robertson v. Sixpence Inns of Am.*, Inc., 789 P.2d 1040, 1047 (Ariz. 1990) ("Ordinarily, the question of proximate cause is a question of fact for the jury. Only when plaintiff's evidence does not establish a causal connection, leaving causation to the jury's speculation, or where reasonable persons could not differ on the inference derived from the evidence, may the court properly enter a directed verdict.").

Here, the analysis is complicated by the fact that Plaintiff proffers Dr. Willis's causation opinion as one reason why the evidence should be deemed legally sufficient to survive summary judgment. But as discussed in Part I above, Dr. Willis's causation opinion is inadmissible. Thus, Plaintiff is left to rely on his testimony that he immediately felt a pinching sensation that was similar to the sensation he experienced during earlier disc herniations and the fact that he was diagnosed with a herniated disc 28 days after the incident.

Defendant contends that such evidence is necessarily deficient because, under Arizona law, "medical expert testimony is required to establish causation." (Doc. 67 at 7.) However, the case that Defendant cites in support of this assertion, *Rasor*, holds that

1   "expert medical testimony normally is required to establish proximate cause *in a medical*

2   *negligence case*."  419 P.3d at 958 (emphasis added).  This is not a medical negligence

3   (*i.e.*, malpractice) case.  Defendant has not cited,[6] and the Court is unaware of, any Arizona

4   case holding that expert testimony is always required to prove causation in a routine

5   negligence case such as this one.  *See generally Nyerges v. Hillstone Restaurant Group*

6   *Inc.*, 2021 WL 3299625, *24 n.15 (D. Ariz. 2021) ("Although Arizona courts require expert

7   testimony on causation in certain categories of lawsuits [such as medical malpractice],

8   Hillstone has not identified any authority suggesting that expert testimony of causation is

9   required in . . . a common-law negligence action.  Furthermore, Arizona courts have stated

10  that, in general, '[p]roximate cause may be determined from circumstantial evidence.'

11  Thus, the Court assumes for purposes of this order that it would have been possible for

12  Plaintiffs to prove causation even if they hadn't proffered an expert's opinion on that

13  topic.") (cleaned up).  Nor would such a conclusion be intuitive, given that many of the

14  heightened evidentiary requirements that apply in medical malpractice actions are unique

15  to that context.  *See, e.g.*, *Seisinger v. Siebel*, 203 P.3d 483, 492-93 (Ariz. 2009) ("Arizona

16  common law decisions requiring expert testimony from physicians in medical malpractice

17  _____

18  [6]      *Kreisman v. Thomas*, 469 P.2d 107 (Ariz. Ct. App. 1970), which Defendant cited
    during oral argument, does not change the analysis.  There, the plaintiff asserted a

19  negligence claim against a "hearing aid dealer" after "develop[ing] a severe ear infection
    known as Otitis externa" that was allegedly caused by the dealer's "negligence in not

20  properly adjusting [a] new set of hearing aids at the time [he] loaned them to plaintiff and
    attached them to plaintiff's glasses."  *Id.* at 109-10.  After the trial court entered a directed

21  verdict in the defendant's favor on multiple grounds, including insufficient evidence of
    causation, the plaintiff appealed.  *Id.*  In the first portion of the appellate decision, which

22  addressed the sufficiency of the causation evidence, the court began by noting that "[t]he
    parties agree that because of the nature of the injuries here involved, expert testimony

23  bearing on causation was required."  *Id.* at 110.  However, the court ultimately declined to
    rule on the sufficiency of the causation evidence because the directed verdict could be

24  affirmed for other reasons.  *Id.* at 111 ("[B]ecause of the existence of other grounds which
    adequately support the granting of the directed verdict by the trial court, we need not

25  determine whether this expert testimony, together with the above-mentioned 'other'
    evidence, is sufficient to establish a Prima facie showing of causation.").  Given this

26  backdrop, the Court does not view the quoted passage in *Kreisman* about the necessity of
    expert causation evidence as a holding that such evidence is always required to establish

27  causation in an Arizona negligence action—that passage was unaccompanied by legal
    citations, seemed to reflect a stipulation of the parties, and was unnecessary to the ultimate

28  resolution of the case.  Tellingly, other Arizona courts have not construed *Kreisman* as
    establishing a hard-and-fast rule requiring expert causation evidence in all negligence
    actions in the 52 years since *Kreisman* was decided.

cases long predated the adoption of the Arizona Rules of Evidence in 1977. . . .  [T]he requirement of expert testimony in a medical malpractice action is a substantive component of the common law governing this tort action.  The common law requirement reflected a policy decision by the courts that the plaintiff's substantive burden of production could only be met by a particular kind of evidence.  The common law requirement thus effectively established an element of the cause of action, by specifying the kind of proof necessary to meet the plaintiff's burden of production."); A.R.S. § 12-2603(A), (B)(4) (absent certain exceptions, when "a claim against a health care professional is asserted in a civil action," the claimant must file a "preliminary expert opinion affidavit" that establishes, among other things, "[t]he manner in which the health care professional's acts, errors or omissions caused or contributed to the damages or other relief sought by the claimant").

Although it presents a close call, the Court concludes that Plaintiff's remaining evidence, construed in the light most favorable to him, is just enough to create a triable issue of fact on the issue of causation.  Plaintiff testified that he felt a pinching sensation in his back immediately after the slipping incident that was similar to what he felt during his two previous disc herniations, and it is undisputed that Plaintiff was diagnosed with a disc herniation less than a month later.  Under these circumstances, a reasonable juror could permissibly infer a causal relationship between the slipping incident and the herniation injury.  And "[w]here cause-in-fact exists, remoteness in time and space do not defeat proximate cause." *Tellez v. Saban*, 933 P.2d 1233, 1241 (Ariz. Ct. App. 1996).  For similar reasons, Defendant's theory that the herniation was actually caused by Plaintiff's daily activities in the 28 days between the incident and the imaging study presents a factual issue for the jury to resolve at trial, not an issue to be resolved as a matter of law in Defendant's favor at summary judgment.  *Cf. Torres v. Jai Dining Services (Phoenix) Inc.*, 497 P.3d 481, 485 (Ariz. 2021) ("In most cases, a jury as factfinder must decide th[e] issue [of intervening and superseding cause].").

…

…

Accordingly,

**IT IS ORDERED** that:

1.　　Defendant's motion to preclude (Doc. 61) is **granted in part and denied in part**.

2.　　Defendant's motion for summary judgment (Doc. 67) is **denied**.

Dated this 24th day of March, 2022.

_____
Dominic W. Lanza
United States District Judge